Birchard, Judge,
gave the opinion—
As to the questions put to Robert Thompson, and his answers, little need be said. The questions were proper for the purpose of testing the value and extent of the opinion given by him, on his examination in chief.
No better illustration of the question could be given than was furnished by the examination of this witness, who stated that he saw nothing like phrenzy or raving madness, and that he had detected nothing of what, technically speaking, is comprised in the expressive term “ delusion.” He thought, perhaps, Clark was deluded on the 487] subject of his name, *as he insisted it was William Y. Graham, and not Wm. Clark; also, in reference to a water pump, which he professed to have invented.
But other proof established the fact that he had been engaged in an *488 effort to improve a water pump, and that his true name was William Y. Graham ; but, admitting the delusion as to these two subjects, there was not the slightest evidence to connect it with the act of taking the life of Cyrus Sells. The defendant sought to make out a ease of general insanity, or, if the proof would better sustain it, of partial insanity. The defence looked to whatever form of insanity might prove most available, when all the evidence should be before the jury.
Viewing the case, and the state of facts existing at the time the questions were put to Doctor Thompson, and it would seem that each one of the questions and answers were relevant to the issue tendered by the defendant, for each one tended, to some extent, to show that the state of general insanity relied on by him did not exist
Upon the other point presented by the bill of exceptions, there is more difficulty. To determine what the rule is, and should be, it will be useful to look to adjudications upon analogous questions, and to the subject matter of the inquiry, and to the reason of the rule itself. The bill of exceptions shows the true character of the objection taken to the testimony of Domigan, and the nine other nonprofessional witnesses, to be this, that they could give no opinion as to the insanity of the accused, under any circumstances. It was not' that they did not detail the facts upon which they had formed the opinion stated by them. Although such an objection is argued, it does not belong to the case, and will not be considered on error. It was required of the witnesses to state the facts upon which they based their opinions, unless considered as waived by counsel, in order to abridge .the time occupied by the trial. The rule in Dickinson v. Baker, 9 Mass. 227, was adhered to : “ That the opinion of physicians, as to a party’s insanity, was not to be received as evidence, unless predicated upon facts, testified to, either by them or others.” It is the same as in 8 *Mass. 371, where it was held “ that physicians, in giving an [488 opinion as to insanity, must state the circumstances or symptoms from which they drew their conclusions,”
Throughout the whole trial, and as often as the question was raised, or objection made, this was the ruling of the court, for, upon the facts almost, if not entirely, depended the value of every opinion, whether professional or nonprofessional. Hence the bill of exceptions states the one and only ground of objection to have been, that nonprofessional witnesses were allowed to give their opinion as to the feigned or real character of the pretended insanity of the defendant, based upon the facts which they knew, and had witnessed, and were upon the stand, ready to relate.
*489 In examining this question, it should be remembered that “ insanity is a disease of the mind, which assumes as many and various forms as. there are shades of difference in the human character. It exists in all imaginable varieties, and in such a manner as to render futile any attempt to give a classification of its numerous grades and degrees that would be of much service, or, under any circumstances, safe to be relied upon in judicial investigations. It is an undoubted fact, that, in determining a question of lunacy, the common sense of mankind must ultimately be relied on, and, in the decision, much assistance can not be derived from metaphysical speculations, although a general knowledge of the faculties of the human mind, and their mode of operations, will be of great service in leading to correct conclusions.” Shelford on Lunacy, 38.
The verdict of a jury, on a question of insanity, is but the opinion of nonprofessional men, formed upon facts and science disclosed and learned at the trial. They have facts and opinions to consider and weigh. The credibility of all witnesses is not the same. The value of all their opinions is not the same. It would be but a farce to try such a question upon the strength of medical opinions, and to regard the weight of evidence always on the side which produced the greatest numbers. Sir John Nicholl in Evans v. Knight, 1 Add. 239, observes 489] that “ experience in the ecclesiastical court taught him that *evidence on questions of capacity, being commonly that of opinion, merely, was almost always contradictory; that perhaps no two will have seen the party at the same time, and under the same circumstances ; and that each measures by his own standard. ’ ’
The difficulties witnessed by Sir J. Nicholl, almost always occur when the opinions of physicians are required in cases of medical jurisprudence. Whenever they have enlisted on the side of either party, or of some favorite theory, and one portion of the profession is placed in array against another, the difficulties mentioned in the passage above quoted, are greatly multiplied, and, however honest or renowned for professional character the witnesses may be, such will be the conflict of their testimony, in nine eases out of ten, that it will be utterly unsafe for a jury or court to follow, or adopt, the conclusions of either side.
The jury must exercise their own judgment and good sense after all, and do justice accordingly, profiting by the aids derived from the conflict, but in spite of the obstacles it creates. Insanity is a disease of the mind ; and physicians, with all the science they possess, are as yet *490 like the masses of mankind, without any certain knowledge of the-nature of the thing disordered. They know, and all men know, that mind exists. By the results it produces in a healthy state, all men have equal evidence that it is ; but what it is, how to fathom, span or define its nature, is what we lack direct facts and analogies to enable us to do. Philosophers and physicians are here upon a level with the common masses of our race, and if wiser upon the subject, it is because-they have been more astute and attentive observers. Every one who associates with his species, acquires, daily, correct knowledge of the-natural operations of the human mind, and a capacity to form an opinion, if there should happen to be an aberration from the path of sanity, in any of his constant associates. The ability to form -a just conclusion will depend much upon his native intelligence and accuracy of observation. .Haslam, page 5, and Shelford, 70, remark “that it has been questioned whether medical evidence *to prove insan- [490' ity, be not inferior to that of other people who may have had opportunities of observing the individuals, when the same opportunities have not been in the power of the practitioner.” It may be impossible for a physician, who has not become familiar, by experience, with some of the peculiar, indefinable, but certian indicia of insanity, in a case where it is feigned, to determine that it is so, without watching the patient by night, as well as by day for some time, and when he does not know that he is watched, to see whether he can resist hunger, cold and sleep, and whether his conduct affords any sure test to distinguish feigned appearances, assumed for a particular purpose, from a case of' real disordered intellect. It is idle to suppose that none but medical men can do this; and as idle to assume that, when done by an intelligent observer, his conclusions would be worthless. " Doubtless an opinion formed by a person professionally conversant with the disease, upon the same observations, would be the most reliable; but if formed upon any relation of the facts which the observer would be able to give, it would be difficult to say, in many cases, that it would be the-safest. A careful daily observer of -ar person feigning madness would witness innumerable acts, motions and expressions of countenance, which, with the attending incidents and circumstances, conclusively satisfy him of the fictitious character of the pretended malady, but which he could never communicate to a jury or scientific man, so as to-give them a fair conception of their real importance. From poverty of language, these facts, should a witness attempt to detail them,, would necessarily be mixed up with opinions, general or partial, in- *491 spite of his best efforts to avoid it. There are things well known to all persons which our language only enables us to express by words of comparison — such are the peculiar features of the face indicating an «excitement of the passions, affections and emotions of the mind, as hope, fear, love, hatred, pleasure, pain, etc. Testimony affirming the existence or absence of either of these, is but a matter of opinion. 'So the statement of the fact that a man’s whole conduct is natural, is 491] but the opinion of the *witness, formed by comparing the particular conduct spoken of with the acts of the past life of the individual. It would hardly be claimed that such evidence should be excluded, yet it is equivalent to an opinion that the person is sane.
We are not now considering whether professional witnesses shall be permitted to give an opinion upon the question of sanity, and under what circumstances, but whether, in the absence of such testimony, •and under any circumstances, an opinion may be evidence, coming from a nonprofessional witness. To test the propriety of the thing, let us suppose a case of simulated or real insanity to be tried, in which .•no scientific person could be had to speak as to any prior and attending conduct or appearances, and when the jury must be left to decide the issue from facts unprofessionally detailed to them by the neighbors and acquaintances of the party. Can it be supposed that they would be more likely to form a correct opinion upon such a statement •of facts, unaided by the inferences and impressions made upon the witnesses familiar with the ordinary conduct of the individual, than the opinion of those witnesses, formed upon the same facts, better •understood, one step farther removed from uncertainty and misapprehension, and aided and illustrated by many minute acts and expressions, etc., which could never be related? Common sense teaches every person that they could not; and it will follow that there is no ■sound reason for excluding the opinion, as limited, from the jury, and that sanity ought to be held an exception to the general rule ; but, at the same time, we by no means intend to undervalue the importance •of the opinions of scientific men when properly given. Medical testimony is of too much importance to be disregarded. When delivered with caution, and without bias in favor of either party, or in aid of ■some speculation and favorite theory, it becomes a salutary means of preventing even intelligent juries from following a popular prejudice, and deciding a cause on inconsistent and unsound principles. But it should be given with great care and received with the utmost caution, .and, like the opinions of neighbors and acquaintances, should be re *493 garded as of little weight if not well sustained by *reasons arid [492 facts that admit of no misconstructions, and supported by authority of acknowledged credit. See Smith’s Anal. 197.
It is contended that the testimony was admitted contrary to all the authorities. We are prepared to admit that there are some against it; but the authorities are conflicting. In the probate of wills, and in issues to try their validity, the subscribing witnesses are allowed and required to state that, in their opinion, the testator was of sound and disposing mind and memory. In the English ecclesiastical courts, which have exclusive jurisdiction on the subject, “ when the evidence proves the execution of a will, but the witnesses have not been examined as to the sanity of the testator, the cause will be adjourned, and liberty will be given to exhibit an interrogatory to prove his sanity.” See 6 Russell, 526, 527 ; 2 Atk. 56. In Lowe v. Jolliffe, 1 W. Bl. 365, on an issue out of chancery, divisavit vel non, the subscribing witnesses to a will and codicil, and about a dozen servants of the testator, swore him to be utterly incapable of making a will; and, to contradict this evidence, several of the nobility and gentry who were acquainted with him, and two physicians, all deposed to his entire sanity. The latter evidence prevailed, and three of the subscribing witnesses were afterwards convicted of perjury. In the case of Drew v. Clark, 1 Flagg, 18, and 3 Add. 79, 209 ; the validity of the will of Ely Stott was successfully contested on the ground of monomania ; and, on the trial, several of his friends and acquaintances testified “ that they never considered or even suspected that he was deranged in his mind.” Some were medical men, and some not, but the opinions of all were received in evidence. In Fuller v. Allison, 3 Flagg, 527, 547, the testator’s solicitors and physicians and the subscribing witnesses to the will, all testified their opinions as to his sanity. I have not been able to find that there was ever a contrary decision in the English ecclesiastical courts ; although, at the trial, relying on the digests and elementary writers, I supposed that all the English authorities were the other way.
*In Connecticut, witnesses who were not professional, were [493 allowed to state their opinions, on the trial of a defence of lunacy, in connection with the facts on which they were formed. Grant v. Thompson, 4 Conn. 208.
Judge Swift, in his Treatise upon Evidence, treats sanity as an exception to the general rule, because “ the testimony of witnesses on *494 this subject will generally be in the shape of an opinion. But,” says he, “ they must detail the facts.” (p. 111.)
In Poole v. Richardson, 3 Mass. 330, the subscribing witnesses were-allowed to state their opinions of the soundness of the testator’s mind, and other witnesses were allowed to testify to his appearance, and to any facts from which the state of his mind might be inferred, “ but not to testify merely their opinions or judgments.”
A later case (Buckminster v. Perry, 4 Mass. 593) may tend to explain this ; for in that it appears that persons not professional, and not subscribing witnesses, stated their opinions. Parsons C. J., in charging the jury, remarked, that the question was confined to the-sanity of the testator at the time of making the will.
The Supreme Court of Pennsylvania held that facts, and opinions of sanity founded upon them, may, as to a testator, be received from any of his acquaintances. Rambler v. Tryon, 7 Serg. and Rawle, 90 ; Wogan v. Small, 11 Serg. and Rawle, 141.
Similar evidence was received some twenty years since, in the Circuit Court of the United States, as appears from the charge of Justice Washington, in Harrison v. Rowan, Wash. C. C. R. 580 ; and in New Jersey, on the trial of Mercer for the murder of Heberton, the same species of evidence was admitted, on argument. On the trial of Gardner, for the murder of Maria Buel, insanity was set up as a defence, and several of his neighbors testified that they did not consider him insane. Wright, 398.
These cases seem to sustain the court, and show that there was no error in overruling the objection to the evidence given by Win. Domi 494] gan, and the other nine nonprofessional witnesses. *The case of McKee v. Nelson, 4 Cowen, 356, supports the doctrine by strong analogy. It was held in that case that the opinion of a witness, that the plaintiff in an action for the breach of a marriage promise was sincerely attached to the defendant, was admissible. The court say— “ It is true, as a general rule, that witnesses are not allowed to give their opinions to a jury, but there are exceptions, and we think this one of them. There are a thousand nameless things indicating the existence and degree of the tender passion, which language can not specify. The opinion of witnesses on this subject must be derived from a series of instances passing under their observation, which yet they never could detail to the jury.”
Application refused, (a)

 The following portions of the Charge to the Jury, by Judge Birchard, were reduced to writing, and approved by the other judges before delivery :
“The statute defining the crime, is in these words: — ‘If any person shall purposely, and of deliberate and premeditated malice, kill another, every such person shall be guilty óf murder in the first degree.’ The words purposely, of deliberate and premeditated malice, as applied to the act of killing, have much meaning. Purposely implies an act of the will; an intention ; a design to do the act. It presupposes the free agency of the ac.tor. Deliberation and premeditation require action of the mind. They are operations of the intellectual faculties, and require an exercise of reason, reflection, judgment and decision, and can not happen in any case where the faculties of the mind are deranged, destroyed, or do not exist. The crime of murder in the first degree ■can, therefore, only be perpetrated by a free agent, capable of acting or of abstaining from action —free to embrace the right and to reject the wrong. He must have a sound intellect, capable of reason, reflection, premeditation, and under the control of the will. These words of the statute imply the legal principle upon which the counsel of the traverser have rested the main question of his defence. What, then, is the important fact for you to try, and how shall it be stated ? The varied and extensive learning which this trial has elicited from professional gentlemen of eminent attainments, and the authorities read in your presence, are sufficient to show the difficulty of the subject. But it is not insurmountable, if you will carefully consider, and fully comprehend the words used, and their connection with each other. The question may be safely stated to you thus: Was the accused a free agent in forming the purpose to kill Cyrus Sells ? Was he, at the time the act was committed, capable of judging whether that act was right or wrong ? and did ho know at the time that it was an offence against the laws of God and man ? If you say nay, he is innocent. If yea, and you find the killing- to have boon purposely, with deliberate and premeditated malice, he is guilty.
In trying this question, you will bear in mind that the law presumes every person, of the age of fourteen years, to be of sufficient capacity to form the criminal purpose ; to deliberate and premeditate upon the acts which mal.i«e, anger, hatred, revonge, or other evil disposition might !iimpel him'to [495 perpetrate. To defeat this legal presumption, which meets the defence of insanity at the threshold, the mental alienation relied upon by the aceused must be affirmatively established, by positive or circumstantial proof. You must be satisfied, from the evidence, that the perverted condition of .the faculties ■of the mind, indicated in the main question which I have already stated as excusing from crime, did exist at the time Sells was killed.
It is not sufficient if the proof barely shows that such a state of mind was possible; nor is it sufficient if it merely shows it to have been probable. The proof must be such as to overrule the legal presumption of sanity; it must satisfy you that he was not sane It would bo unsafe to let loose upon society great offenders upon mere theory, hypothesis or conjecture. A rule that would produce such a result -would endanger community, by creating a means of eseape from criminal justice, which the artful and experienced would, not *496 fail to embrace. The defence of insanity is not uncommon. It is by no means a new thing in a court of justice; it is a defence often attempted to be made, more especially in cases where aggravated crimes have been committed, under circumstances which afford full proof of the overt acts, and render hopeless all other means of evading punishment. While, then, the plea of insanity is to be regarded as a not less full and complete, than it is a humane defence, when satisfactorily established, and while you should guard against inflicting the penalty of crime upon the unfortunate maniac, you should be equally careful that you do not suffer an ingenious counterfeit of the malady to furnish protection to guilt. Supposing that you should find the proof of insanity prior to, and subsequent to the homicide, sufficient, counsel have requested us to instruct you that the defendant must go acquit, even if you should find that the act was committed during a lucid interval. We do not so understand the law. An act done during a lucid interval, is an act for which the law will hold the individual accountable. By a lucid interval, we mean that state of mental sanity which is indicated in the main question that I have already stated to you. Proof of prior insanity throws upon the state the burden of proving the crime perpetrated during a lucid interval. It defeats the legal presumption of sanity, and creates a legal presumption of continued lunacy, which, like the former, must be satisfactorily overthrown by proof. This is its sole effect.
What is a reasonable doubt?
A verdict of guilty can never be returned without convincing evidence. The law is too humane to demand a conviction while a rational doubt remains in the minds of ft jury. Tou will be justified, and are required to consider a reasonable doubt as existing, if the material facts, without which guilt can not be established, may fairly be reconciled with innocence. In human affairs absolute certainty is not always attainable. Prom the nature of things reasonable certainty is all that can be attained on many subjects. When a full and candid consideration of the evidence produces a conviction of guilt, and satisfies the mind to a reasonable certainty, a mere captious or ingenious artificial doubt is of no avail. Tou will look, then, to all the evidence, and if that satisfies you of the defendants’s guilt, you must say so. If you are not fully satisfied, but find only that there are strong probabilities of guilt, your only safe course is to acquit.